UNITED STATES of America

v.

**Gezo Goeong EDWARDS,
et al., Defendants.**

**Criminal Nos. 11–129–1(CKK), 11–129–2(CKK), 11–129–11(CKK).**

United States District Court,
District of Columbia.

July 26, 2012.

Opinion Denying Reconsideration
Sept. 16, 2012.

Opinion Denying Reconsideration
Oct. 23, 2012.

**4**

Debra L. Long–Doyle, Steven B. Wasserman, U.S. Attorney, Washington, DC, for United States of America.

David Walker Bos, Federal Public Defender for D.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

COLLEEN KOLLAR–KOTELLY, District Judge.

Defendants Gezo Goeong Edwards, William Bowman, Henry Brandon Williams, and eleven co-Defendants were charged by superseding indictment with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and thirteen other individual counts. Superseding Indictment, ECF No. [28], at 1–8. Defendants Edwards, Bowman, and Williams are proceeding to trial. Presently before the Court are the following motions *in limine:*

- Defendant Edwards' [241] Motion to Suppress Evidence Seized from 1219 Elm Grove Circle, Silver Spring, MD;
- Defendant Edwards' [242] Motion to Suppress Evidence Obtained from Interception of Visual Non–Verbal Conduct in or Near Storage Unit A306;
- Defendant Edwards' [244] Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications;
- Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications (Doc # 244);
- Defendant Bowman's [248] Motion to Suppress Evidence and Statements Resulting from Illegal Wiretap Surveillance;
- Defendant Bowman's [252] Motion to Suppress Evidence Obtained from the Search and Seizure of the Defendant's Cell Phones After His Arrest on April 26, 2011, as Fruit of the Poisonous Tree;
- Defendant Bowman's [253] Motion to Suppress Statements Made by the Defendant After his Arrest on April 26, 2011, as Fruit of the Poisonous Tree;
- Defendant Bowman's [256] Motion to Suppress Visual and Non–Verbal Evidence Obtained from the Use of a Closed Circuit Television ("CCTV") Placed Inside of Storage Unit A306, at the Public Storage Store Located at 3005 Kenilworth Avenue, Hyattsville, Maryland; and
- Defendant Bowman's [257] Motion to Suppress Evidence Obtained from Storage Unit A306, at the Public Stor-

age Store Located at 3005 Kenilworth Avenue, Hyattsville, Maryland.

Defendant Edwards' [244] motion to suppress and Defendant Bowman's [248] motion to suppress seek to suppress the wiretap interception authorizations issued for telephones purportedly used by Defendant Bowman. Defendant Edwards' [247] motion to amend seeks to amend his motion to suppress the wiretap to include the affidavits filed in support of the wiretap applications, which were inadvertently omitted from his initial filings. The other motions listed above ask the Court to suppress other evidence obtained at least in part because of the intercepted communications, on the basis that this evidence is "fruit of the poisonous tree." For the reasons stated below, Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications is GRANTED; the remaining motions are DENIED.

## I. BACKGROUND

The Government alleges that from January 2009 until April 2011, the Defendants engaged in a conspiracy to distribute and possess with intent to distribute large quantities of cocaine. Superseding Indictment at 1–3. Specifically, the Government asserts that Defendants Edwards and Bowman obtained large quantities of cocaine from supplier(s) in southern California, and transported the cocaine back to the Washington, D.C. metropolitan area. Gov't Resp., ECF No. [290], at 2. Defendant Bowman would then (1) distribute some of the cocaine to other narcotics traffickers, including Defendant Williams; (2) distribute some of the cocaine on behalf of Defendant Edwards; and (3) convert some of the cocaine to cocaine base ("crack cocaine"), and distribute the crack cocaine to his own customers. *Id.* As part of the investigation, the Government applied for and received several court-authorized wiretap interceptions of three separate cellular telephones, discussed below.

### A. Target Telephone 1: 202–262–2549

On December 7, 2010, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 1. The Affidavit of FBI Special Agent Timothy S. Pak noted that the cellular phone was registered to John Doe and associated with a fictitious address in the District of Columbia, but had been used by Bowman on several occasions. 12/7/10 Pak Aff. ¶¶ 4b, 7. Judge Richard W. Roberts granted the application, but the wiretap was terminated due to a lack of activity on December 27, 2010. Gov't Resp. at 4 n. 3. 1/13/11 Pak Aff. ¶ 4c.

### B. Target Telephone 2: 202–445–1553

On January 13, 2011, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 2. 1/13/11 Pak Aff. TT2 was registered to "Sam Leonard" and associated with a fictitious address in the District of Columbia. *Id.* at ¶ 7. The Affidavit listed Bowman, Andrew Colter, Omar Ismaeel, Slonsio Cheah, and Michael Rivers as possible targets of the wiretap. *Id.* at ¶ 5. It specifically alleged that the investigation "has determined that Bowman is utilizing the target telephone to discuss and facilitate drug trafficking in the Washington, D.C. area," and the wiretap was sought in order to determine:

(i) "the nature scope, and extent of the narcotics trafficking and other illegal activities in which the targets are engaged";

(ii) "the methods of operations and procedures of the targets including, but not limited to, the means and man-

ner by which individuals are obtaining and redistributing large quantities of cocaine in various locations in the United States";

(iii) "the identities, roles, and telephone numbers of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities";

(iv) "the source of money and controlled substances, primarily cocaine";

(v) "the manner in which these illegal activities are being conducted, including the distribution and possession of said controlled substances, and the money involved in those activities";

(vi) "the existence and location of apartments, residences, businesses, and other premises utilized in furtherance of these illegal activities";

(vii) "the methods of operation for laundering proceeds of illegal drug sales";

(viii) "the existence and location of records of the illegal activities";

(ix) "the existence, location, and source of the resources used to finance the illegal activities";

(x) "the existence, location, and disposition of the proceeds from those activities";

(xi) "the existence and locations of other items or means used in furtherance of those activities";

(xii) "the dates, times, and details for the continued commission of the above-mentioned offenses"; and

(xiii) "other evidence necessary for the successful prosecution and conviction of the above-described criminal activities."

1/13/11 Pak Aff. ¶¶ 7, 9b. The factual allegations contained in the Affidavit are discussed at length *infra*, Section III.A, C. Chief Judge Royce C. Lamberth authorized the wiretap for thirty days. Gov't Ex. A. Judge Richard W. Roberts reauthorized the wiretap for additional thirty day periods on February 11, 2011, March 11, 2011, and April 8, 2011. Gov't Exs. B–D. Defendant Edwards was added as a possible target as part of the April 8, 2011 reauthorization. 4/8/11 Pak Aff. ¶ 6.

### C. Target Telephone 3: 202-425-5430

On March 19, 2011, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 3. 3/21/11 Pak Aff. TT3 was registered to William Bowman and associated with 125 16th Street, NE, Washington, D.C. *Id.* at ¶ 7. The Affidavit listed Bowman, Edwards, Slonsio Cheah, Tracy Brooks, Willie Moorer, Robert Richards, and Shawn Lucas as possible targets of the wiretap. *Id.* at ¶ 5. Judge Roberts reauthorized the wiretap for an additional thirty days on April 15, 2011. Gov't Ex. F.

### D. Superseding Indictment

The Grand Jury returned the Superseding Indictment on June 16, 2011, charging fourteen Defendants with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. Superseding Indictment at 2–3. The Superseding Indictment alleges the Defendants engaged in the conspiracy from about January 2009 until at least April 26, 2011. *Id.* at 2. In addition to Edwards, Bowman, and Williams, the Superseding Indictment named Robert Richards, Willie Moorer, Nathaniel Harrison, Omar Ismaeel, Earl Charles, Sean Crawford, Joseph Tolbert, William Wilson, Jr., Roscoe Minns, Tracy Brooks, and Shawn Lucas as co-Defendants and co-conspira-

tors. *Id.* at 2–3. Defendant Edwards faces two counts of using, carrying, and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). *Id.* at 6. Defendant Bowman also faces three counts of using, carrying, and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c), three counts of unlawful distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and two counts of unlawful distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).[1] *Id.* at 3–4, 6–7. Defendant Williams is only charged in the conspiracy count.

## II. LEGAL STANDARD

█ Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.,* provides that a district court may authorize an application for interception of certain wire, oral, and/or electronic communications. 18 U.S.C. § 2518.

> Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that—
>
> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Subsection "c" is referred to as the "necessity requirement." *United States v. Carter,* 449 F.3d 1287, 1292 (D.C.Cir.2006). The statute further provides specific requirements for the contents of the order granting an application under Title III, including that the order require that the interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). This "minimization requirement" obliges the Government to make reasonable efforts to minimize the interception of non-relevant conversations. *Carter,* 449 F.3d at 1292.

█ Any "aggrieved person"—that is, any person who was a party to any intercepted communication, 18 U.S.C. § 2510(11)—may move to suppress the contents of any interception under Title

---

1. The Superseding Indictment charged Defendant Bowman with two counts of unlawful distribution of 5 grams or more of cocaine base, but the Government indicated it will proceed against Defendant Bowman on the lesser included offense of unlawful distribution of cocaine base. Gov't Resp. at 3 n. 2.

III on the basis that: (1) "the communication was unlawfully intercepted"; (2) "the order of authorization or approval under which [the communication] was intercepted is insufficient on its face"; or (3) "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). Here, Defendants Bowman and Edwards contend their communications were "unlawfully intercepted," and that the interceptions did not conform to the court's authorization insofar as the Government did not comply with the minimization requirement. The Defendants also request a *Franks* hearing to challenge the application in the event the Court determines the affidavit is facially valid.

A movant seeking to obtain a Franks hearing must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth. To mandate an evidentiary hearing, the movant's attack on the affidavit supporting the warrant must be more than conclusory.

*United States v. Becton,* 601 F.3d 588, 594 (D.C.Cir.2010) (internal quotation marks and citations omitted).

## III. DISCUSSION

The Defendants' motions challenge the validity of the initial authorization for interception of communications to and from TT2 on January 13, 2011, and by extension all future authorizations on TT2 and TT3, but do not independently challenge the validity of any later authorizations. Defendants allege the January 13, 2011 authorization is invalid for three reasons: (1) facially, the warrant did not meet the necessity requirement for issuance of a wiretap; (2) the Government did not comply with the minimization requirement in carrying out the wiretaps; and (3) Special Agent Pak's Affidavit omitted material information, entitling the Defendants to a *Franks* hearing regarding the validity of the wiretap authorization. The Court finds the January 13, 2011 Affidavit met the necessity requirement for a Title III wiretap, the Defendants failed to set forth a challenge the Government's minimization efforts, and the Defendants failed to make a substantial showing that the Government omitted material information from the wiretap affidavit. Accordingly, Defendants' motions to suppress the Title III wiretaps are denied.

### A. The January 13, 2011 Pak Affidavit Provides Sufficient Facts to Establish the Necessity of the Requested Interceptions

■■■ Defendants contend that Special Agent Pak's January 13, 2011 Affidavit failed to satisfy Title III's necessity requirement because it failed to establish that traditional investigative techniques were insufficient. "Congress created the necessity requirement to ensure that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *Carter,* 449 F.3d at 1293 (quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). Although the Court must "give close scrutiny" to contested applications and "reject[ ] generalized and conclusory statements that other investigative procedures would prove unsuccessful," "the statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Williams,* 580 F.2d 578, 588 (D.C.Cir. 1978) (internal quotation marks omitted). "[A] court may authorize the wiretap of the phone of a member of an operation if

traditional investigative techniques have proved inadequate to reveal the operation's 'full nature and scope.'" *United States v. Brown*, 823 F.2d 591, 598 (D.C.Cir.1987) (quoting *Williams*, 580 F.2d at 590). In this case, Defendants argue that Special Agent Pak's Affidavit fails to allege with sufficient particularity that (1) undercover officers/confidential sources; (2) physical surveillance; (3) trash covers; (4) search warrants/Grand Jury subpoenas; and (5) pen registers would be insufficient to reveal the full scope of Bowman's suspected operation.

### 1. *Undercover Officers/Confidential Sources*

Special Agent Pak's Affidavit indicates that neither undercover officers nor confidential sources would be successful in learning Bowman's source(s) of cocaine or the hierarchy of Bowman's organization for two reasons: (1) individuals like Bowman do not want to reveal their sources and have their customers go to the source directly for narcotics; and (2) Bowman specifically was guarded about revealing the location of his stash house(s) and other details of his operation. 1/13/11 Pak Aff. ¶ 38. Defendants challenge the Affidavit's conclusions, arguing Special Agent Pak offered no explanation as to why the undercover officer and sources could not obtain additional information, since Bowman was not "guarded" in so far as he sold crack cocaine to the undercover officer and CS–2, despite not knowing either individual. Special Agent Pak specifically averred that the undercover officer "was unable to obtain any information about Bowman's narcotics trafficking organization." *Id.* Moreover, the fact that Bowman was willing to sell narcotics to the undercover officer and confidential sources he barely knew does not negate Special Agent Pak's observation that Bowman kept certain informa-

tion, such as the location of his stash house, from his customers. *Id.*

Defendant Edwards offers a new argument in his reply, stating that the fact Bowman had to travel to his stash house to obtain the narcotics during controlled purchases "shows [sic] common practice among drug dealers, who typically do not carry drugs on their persons for fear of being arrested or robbed." Def. Edwards' Reply, ECF No. [303], at 3. Even if this assertion were true, it does not establish why Bowman declined to disclose the location of his stash house to the confidential sources, arranging to sell the narcotics at a neutral location. Moreover, Defendants do not dispute that because the confidential sources were merely customers and not members of Bowman's organization, Bowman would not reveal details of the organization to them. 1/13/11 Pak Aff. ¶ 39. Defendants speculate that "neither CS-1 nor the [undercover officer] ever attempted to learn more about Bowman's organization." Def. Edwards' Reply at 4. Assuming the Court was to read the Pak Affidavit in the manner suggested by Defendants, the Government was not required to pursue this course in light of the other evidence in the affidavit indicating such inquiries likely would have been unsuccessful.

For the first time in his Reply, Defendant Edwards contends the Government misled the court by failing to disclose that CS–1 was incarcerated for a period of time with Bowman, and the two actually shared a cell. If anything, this information would have bolstered the conclusion that CS–1 could not obtain additional information about Bowman's organization: despite their history, Bowman only met CS–1 in neutral locations, and would not reveal to CS–1 where the stash house was located. 1/13/11 Pak Aff. ¶ 38.; *id.* at ¶¶ 19, 20.

The Defendants take issue with Special Agent Pak's contention that Bowman was suspicious of CS–2 as indicated by Bowman's refusal to provide CS–2 with his new telephone number (TT2) after abandoning TT1. Defendants contend that Special Agent Pak's conclusion "is completely belied by the fact the CS-2 had another working number for Bowman and that they used that number to discuss drug dealing." Def. Edwards' Mot. at 10. This argument misses the point. The issue with CS–2 was not that he/she could not get in touch with Bowman, but rather that Bowman's refusal to provide CS–2 with TT2 after multiple requests reflected the fact Bowman was suspicious of CS–2. It is because of this suspicion—not a lack of means to contact Bowman—that meant CS–2 would not be a further source of useful information. 1/13/11 Pak Aff. ¶¶ 26–27, 38.

Curiously, Defendants argue that "[a]lthough CS-3 was apparently incarcerated as a result of it's [sic] continued drug dealing even after it began cooperating, there is nothing in the Affidavit to indicate that CS-3 could not be a further source for information to law enforcement." Def. Edwards' Mot. at 10. Special Agent Pak explained that at the time of the affidavit "CS–3 [was] incarcerated and therefore no longer in a position to proactively cooperate in the investigation." 1/13/11 Pak Aff. ¶ 38. Given CS–3's incarceration, "it would be unreasonable to require pursuit of [this] avenue[ ] of investigation," before resorting to a wiretap. *Carter*, 449 F.3d at 1293. Defendants note that CS–3 was able to obtain some insight into Bowman's operation; the Affidavit notes that Bowman purportedly informed CS–3 that Bowman typically purchases four kilograms of cocaine at a time. The Affidavit also reflects the fact that CS–3 purchased quantities of cocaine from Bowman that were significantly greater than those purchased by both CS–1 and CS–2. *Compare* 1/13/11 Pak Aff. ¶ 16 (indicating on multiple occasions CS–3 purchased 125 grams of cocaine from Bowman) *with id.* at ¶¶ 19, 22 (noting CS–1 and CS–2 purchased from Bowman 11 grams and 63 grams of narcotics respectively). The fact that Bowman was more open with a customer who purchased significantly greater quantities of cocaine does not negate the evidence in the Affidavit to indicate Bowman was guarded in his interactions with other customers, including CS–1, CS–2, and the undercover officer.

Defendants further argue that Special Agent Pak's statement that the confidential sources supplied information such as "telephone numbers, descriptions of vehicles, names, [and] addresses" calls into question Special Agent Pak's ultimate conclusion that confidential sources could not reveal the full scope of Bowman's operation. To be precise, Special Agent Pak only made this statement as to CS–1, not CS–2. 1/13/11 Pak Aff. ¶ 12, 15. But fundamentally, this statement is consistent with Special Agent Pak's description of the confidential sources' roles in arranging and performing controlled purchases of narcotics. The Affidavit indicates the confidential sources provided phone numbers for Bowman and information concerning controlled buys, none of which contradicts Special Agent Pak's conclusion that the sources could not provide any *additional* information regarding the conspiracy at large. The affidavit contained sufficient facts for Chief Judge Lamberth to find that confidential sources and controlled purchases could not reveal the full scope of Bowman's suspected operation, and therefore a wiretap under Title III was necessary.

### 2. *Physical Surveillance*

Special Agent Pak explained that "[a]lthough physical surveillance has provided

some helpful information," it is by itself of limited value to investigators. 1/13/11 Aff. ¶ 40. For this investigation, Special Agent Pak noted that investigators observed two meeting between CS–1 and Bowman in July 2010. *Id.* Agents observed Bowman arrive at the meeting location, leave the meeting and travel to his apartment building, then return to the meeting with CS–1. *Id.* The Government believes that Bowman retrieved narcotics from his residence, but "physical surveillance alone was unable to confirm that Bowman actually retrieved narcotics from this location, and if so, where specifically within the building the narcotics were stored." *Id.* Moreover, Bowman did not conduct a significant amount of his narcotics activity outside, further limiting the usefulness of physical surveillance, including pole cameras. *Id.* at ¶¶ 40–41. Defendants' motions omit any reference to these specific limitations of physical surveillance of Bowman's activities. Defendants claim that Bowman did not detect any physical surveillance and would not necessarily flee if he determined he was being observed. Even if this were true, Defendants never respond to Special Agent Pak's contention that given the nature of Bowman's organization, physical surveillance would never disclose the entirety of the organization. The Affidavit indicates the Government engaged in physical surveillance and obtained some useful information, but at the point it would continue to fail to reveal the full scope of the conspiracy, the necessity requirement was satisfied. *Becton,* 601 F.3d at 596.

In his Reply, Defendant Edwards suggests that the physical surveillance attempted in this case was inadequate because the Affidavit refers to physical surveillance only in the context of five controlled purchases of narcotics. Def. Edwards' Reply at 9. Defendant's reliance on *United States v. Gonzalez,* 412 F.3d 1102 (9th Cir.2005) for this proposition is misplaced. In *Gonzalez,* the investigators only attempted a single instance of physical surveillance before giving up, compared to five instances in this case. *Id.* at 1114. Through these five observations, investigators confirmed that Bowman engaged in most of his conduct indoors, while the investigators in *Gonzalez* could only speculate after a single, brief instance of physical surveillance. *Id.* Moreover, the Ninth Circuit employs a different standard for necessity than this Circuit. *Compare id.* at 1112 *with Brown,* 823 F.2d at 598. The five instances of physical surveillance, and the related factual detail regarding Bowman's operation, were sufficient to show that physical surveillance would not reveal the full scope of Bowman's operation, and wiretaps were therefore necessary. *Brown,* 823 F.2d at 598.

### 3. *Trash Covers*

In terms of performing trash covers, Special Agent Pak explained that Bowman resided in a multi-story apartment building, which utilized a communal trash dumpster located between the building in which Bowman resided and another multi-unit apartment building, in view of apartments from both buildings and the street. 1/13/11 Pak Aff. ¶ 43. The dumpster itself was enclosed by a secure five-foot fence. *Id.* Thus, it would be difficult, if not impossible, for agents to search the dumpster without being detected. *Id.* Special Agent Pak further noted that multiple units used the dumpster, making it virtually impossible to link any trash to Defendant Bowman. *Id.*

The Defendants fault Special Agent Pak for failing to explain "why a trash cover could not be conducted under cover of darkness … or whether any agents of the FBI would have trouble climbing the

fence." Def. Edwards' Mot. at 13. Assuming for the sake of argument that agents could access the dumpster, and could do so undetected, the Affidavit established any search of the dumpster would be futile because the Government would face extreme difficulty in connecting Defendant Bowman to evidence recovered from a *communal* dumpster. Requiring the Government to engage in a trash cover that was not likely to succeed in recovering any usable evidence would be unreasonable. A trash cover was "impracticable under the circumstances" and therefore not necessary before resorting to a wiretap application. *Carter*, 449 F.3d at 1293.

### 4. Search Warrants/Grand Jury Subpoenas

The Affidavit explains that agents had not sought or executed any search warrants or issued any Grand Jury subpoenas for two primary reasons: (1) these tools would alert the coconspirators to the investigation before the full scope of the conspiracy was determined; and (2) the warrants/subpoenas would be unsuccessful in uncovering broader information regarding the conspiracy, such as stash house locations and cash flow. 1/13/11 Pak Aff. ¶¶ 44–45. Defendants contend that "[t]here is nothing in this section that indicates why any of these specific investigative techniques would not be fruitful in this investigation." Def. Edwards' Mot. at 13. To the contrary, Special Agent Pak explained that although a search of Bowman's residence would likely confirm the agents' suspicions that it served as a stash house, a search would be unlikely to reveal additional stash locations, the identity of co-conspirators, or the full scope of the conspiracy. 1/13/11 Pak Aff. ¶ 44. Likewise, the Affidavit noted that the Government did not have sufficient information regarding Bowman's drug trafficking organization to effectively issue targeted subpoenas for financial records. *Id.* at ¶ 45. The application for the initial wiretap for TT2 offered specific reasons as to why search warrants and Grand Jury subpoenas would be ineffective to reveal the full scope of the conspiracy *in this case,* and therefore satisfied the Title III necessity requirement on this front.

### 5. Pen Registers

The Affidavit asserted that call detail records and pen registers were useful to some extent, but would not satisfy the Government's burden of proof at trial because the registers alone provide no information regarding the content of the conversations taking place. 1/13/11 Pak Aff. ¶ 47. In terms of call detail records and pen registers, the Defendants are correct that the Affidavit provides only "boilerplate assertions" in the relevant paragraph. However, "[s]ections of an affidavit framed in conclusory terminology" cannot be separated from "preceding detailed descriptions" of investigative efforts. *United States v. Sobamowo,* 892 F.2d 90, 93 (D.C.Cir.1989). Special Agent Pak's Affidavit indicates that using pen registers, agents were able to establish a usage pattern on TT2 of "a larger number of calls to a limited number of phone numbers, and calls of a short duration," typical of narcotics trafficking. 1/13/11 Pak Aff. ¶ 32. Furthermore, call records established that TT2 contacted or attempted to contact suspected co-conspirators Colter and Ismaeel. *Id.* at ¶¶ 33–34. The use of pen registers in this case, and the inherent nature of pen registers (as described by Special Agent Pak) logically lead to the ultimate conclusion offered in the Affidavit that pen registers are "useful mainly in establishing relationships and patterns of operations," but "provide little direct evidence as to the significance of the telephone calls." *Id.* at ¶ 47.

Defendants further contend that wire-taps were unnecessary because using pen registers, the Government could identify individuals with a high level of contact with Bowman, then use physical surveillance and controlled buys to confirm involvement in the conspiracy. As explained above, controlled purchases alone could not have revealed the full extent of the conspiracy. The combination of pen registers and controlled buys could have—and did—provide some relevant information. The limitations on these techniques in this case, as explained in Special Agent Pak's Affidavit, demonstrated wiretaps were necessary to achieve the full objective of the investigation.

### 6. Combined Traditional Investigative Techniques

In addition to disputing the effectiveness of individual investigative methods, Defendants contend that wiretap interceptions were not necessary because the combination of traditional tools employed by investigators were sufficient. *E.g.*, Def. Edwards' Mot. at 12. Defendants correctly note that the combination of pen registers, physical surveillance, and confidential sources enabled the investigators to arrange and observe controlled buys of narcotics from Bowman. However, even in combination the information gathered provided limited insight into the conspiracy. The Government was unable to determine, among other things, where in his apartment building Bowman stored the narcotics, 1/13/11 Pak Aff. ¶ 40, the location of other stash houses, *id.* at ¶ 40, or where assets and proceeds related to the conspiracy were held, *id.* at ¶ 45. That combining techniques provided relevant information does not mean investigators were foreclosed from using wiretaps to determine the full extent of the conspiracy. *Becton*, 601 F.3d at 596. Defendants harp on the fact that many of the limitations identified by

Special Agent Pak are common issues in law enforcement investigations. The fact that officers might run into similar barriers in other investigations has no bearing on whether or not Special Agent Pak provided an adequate factual basis to show those barriers were present *in this investigation*. Ultimately, the Pak Affidavit provided sufficient facts to support Chief Judge Lamberth's determination that the necessity requirement had been met, and thus the initial wiretap on TT2 was properly authorized. *Sobamowo*, 892 F.2d at 93.

### B. Defendants Failed to Sufficiently Challenge the Government's Minimization Efforts

 In his motion to suppress, Defendant Edwards challenged the Government to "make a prima facie showing that minimization was complied with respecting conversations between Edwards and others." Def. Edwards' Mot. at 22. Defendant's request reverses the order of proof required in the context of minimization challenges.

What the wiretapping statute forbids is failure by the government to make reasonable efforts to minimize interceptions of non-pertinent communications; consequently, a defendant must identify particular conversations so that the government can explain their non-minimization. Having failed to identify "specific conversations that should not have been intercepted, or even ... a pattern of such conversations," the issue of reasonable minimization [is] simply not in play.

*Carter*, 449 F.3d at 1295 (quoting *United States v. Anderson*, 39 F.3d 331, 342 (D.C.Cir.1994)). The Government is not required to make any showing regarding its minimization efforts unless and until the Defendants identify "any conversation or pattern of conversations by which the [Court] could determine whether or not

the government [has] met its minimization obligations." *Id.* Having failed to do so, Defendants' minimization argument fails.

### C. Defendants are Not Entitled to a Franks Hearing

 Defendants argue that Special Agent Pak knowingly and intentionally, or with reckless disregard for the truth, omitted material information from the Affidavit. An affidavit filed in support of an application for a Title III wiretap is presumptively valid. *United States v. Maynard,* 615 F.3d 544, 550 (D.C.Cir.2010). However,

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. This test applies to material omissions from affidavits as well as false statements. *United States v. Johnson,* 696 F.2d 115, 118 n. 21 (D.C.Cir.1982). An omission is "material" only if its " 'inclusion in the affidavit would defeat probable case.' " *United States v. Spencer,* 530 F.3d 1003, 1007 (D.C.Cir.2008) (quoting *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir. 1990)). The Defendants must make a substantial showing that is "more than conclusory" and "accompanied by an offer of proof." *United States v. Gaston,* 357 F.3d 77, 80 (D.C.Cir.2004).[2] Defendants contend that the Affidavit omitted two materi-

al issues that require a *Franks* hearing: (1) prior investigations of Bowman and Edwards; and (2) prior use of investigative techniques Special Agent Pak claimed would not be fruitful in this case. The Court finds Defendants failed to make a substantial showing that the purported omissions were material, and therefore an evidentiary hearing is not required.

### 1. The Failure to Disclose Prior Investigations of Bowman and Edwards was Not a Material Omission

 Defendants identify several prior "investigations" of Edwards and Bowman that, according to Defendants, belie the stated intention of the wiretap, that is, to gain information regarding Bowman's sources and co-conspirators, their roles/relationships, and methods of packaging and distribution. Def. Edwards' Mot. at 15–16. The Defendants identify the following investigations as relevant:

- "Early 2000s" investigation "into alleged crimes committed by" Edwards, Earl Davis, Terrence Jones, Thomas Holley, Bowman, James Parker, Shawn Lucas, and Robert Richards;
- 2004 investigation of Earl Davis, who was arrested for murder while accompanied by Edwards;
- 2007 investigation of Edwards involving "alleged federal drug trafficking and murder conspiracy";
- A separate conspiracy charged in *United States v. Glover,* No. 07–153 (D.D.C. Filed June 12, 2007);
- 2008 search warrant executed at the residence shared by Robert Richards and Terrence Jones; and

---

2. Without any reference to authority, Defendant Edwards asserts that he need only provide a "statement of supporting reasons" to satisfy his burden to make an offer of proof. Def. Edwards' Mot. at 5. The *Franks* decision indicates defendants are required to submit not only "a statement of supporting reasons," but also "[a]ffidavits or sworn or otherwise reliable statements," or an explanation as to why the affidavits could not be furnished. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

- 2008 Grand Jury subpoena issued to Katrina Belton, the mother of Edwards' child.

The parties devote a great deal of effort to discussing particular facts about each investigation. The Defendants in particular lose the forest for the trees: the stated purpose of the wiretap application was to develop information regarding *Bowman's* operation, including sources, co-conspirators, and methods of distribution. To the extent the Government had knowledge of *Edwards'* illicit activities, Defendant Edwards does not show (or even attempt to show) that this information satisfied the objectives regarding *Bowman* as stated in the Affidavit. *See* 1/13/11 Pak Aff. ¶ 9b. Defendants claim that "the government deftly portrayed Bowman, a known associate of Edwards', as the initial target of the investigation," but offer no basis for the Court to ignore the stated intention of the wiretap: to intercept communications from *Bowman's* telephone in order to gain information about *Bowman's* drug trafficking operation. *Id.* at ¶¶ 7, 9b. The Government's suspicion that Edwards supplied Bowman with narcotics does not undermine the Government's representation that the purpose of the investigation was to discover the scope of Bowman's narcotics-related activity.

Defendants generally allege that the early investigations "reveal[ ] a pattern that federal law enforcement was accumulating information about Edwards and, by extension, his associates," but this conclusory statement falls far short of a substantial showing that the Government withheld material information regarding the scope of its knowledge of Bowman's drug trafficking organization in seeking to intercept wireless communications with Bowman. Defendants provide no explanation for the Government's purported knowledge of the roles and relationships of Bowman's co-conspirators, methods of packaging and distribution, nature and scope of the conspiracy, financing and use of proceeds, or numerous other aspects of the investigation. Assuming Defendants could show the Government knew Edwards supplied Bowman with narcotics and that Edwards was Bowman's only supplier, there remain a number of significant aspects of Bowman's operation that the Government lacked information on. 1/13/11 Pak Aff. ¶ 9b(i)-(iii), (v)-(xiii). Negating a single purpose of the wiretap does defeat the necessity finding for the entire wiretap authorization. *United States v. Reed*, 575 F.3d 900, 911 (9th Cir.2009) ("[T]he necessity requirement is directed to the objective of the investigation as a whole.").

The lack of materiality is particularly striking with regards to the investigations of Edwards between 2001 on 2007, during which time Bowman was incarcerated. Gov't Resp. at 18. Defendants provide no explanation as to how investigation of Edwards' conduct during this time frame is material to the Government's knowledge of Bowman's alleged drug trafficking, which did not begin (or resume) until at least 2008. Defendants' assertion regarding the materiality of the 2008 investigation of Terrence Jones takes speculation to a whole new level. Several basic facts are undisputed: (1) in 2008, agents executed a search warrant of the residence occupied by Jones and Richards; (2) neither Jones nor Richards were charged in connection to the drugs recovered during the search; and (3) later in 2008, Jones was arrested on narcotics charges, which led to his incarceration beginning in 2010. From this, Defendants allege that the investigation of Bowman "was a continuation of the Jones investigation." Def. Edwards' Reply at 17. Defendants' only support for this assertion is that Jones' telephone number was intercepted on Bowman's pen register (though Defendants do not disclose how many

times), and the initial indictment in this case alleged the conspiracy began in 2008. *Id.* at 17–18. In his Reply, Defendant Edwards places great weight on a purported statement by Agent Bevington—made in 2012—that Agent Bevington believed Jones should have been charged in this case. Defendants claim this statement was a tacit admission that the 2008 investigation of Jones and the investigation in this case concerned a single conspiracy. This argument assumes the conclusion Defendants seek to prove: that all of Jones' narcotics-related activity, dating back to 2008, was part of the conspiracy in this case. Defendants offer no evidence to establish the link between Jones' narcotics activity in 2008 and the conspiracy at issue here. Even if the Court were to take the multiple leaps of logic Defendants' theory requires, the Court would still lack any evidence that the 2008 Jones investigation revealed any of the information purportedly sought by the January 13, 2011 wiretap application such that the Jones investigation would have been even arguably material to the necessity finding.

The only offer of proof submitted by the Defendants demonstrating any sort of connection between prior investigations and Defendant Bowman is the affidavit submitted by Katrina Belton. Ms. Belton's submission indicates that in "2008 or 2009" she was subpoenaed to appear before a Grand Jury in Greenbelt, Maryland. Belton Decl., ECF No. [303–2], ¶ 3. Ms. Belton indicates she was questioned "about Mr. Edwards and his associates," and shown pictures of Mr. Edwards, Bowman, Jones, Richards, James Parker, and Earl

Davis. *Id.* at ¶ 4. Ms. Belton states that "[f]rom the questions being asked, it was obvious to me that the agents and officers already knew a great deal of information about Mr. Edwards and his associates," but offers no further insight into her discussions with the authorities. *Id.* At best, Defendants make a substantial showing that as of January 2011, the Government knew Edwards and Bowman were associates, but this in and of itself would not defeat the finding of necessity or probable cause.

For his part, Defendant Bowman focuses on the fact the Government omitted from the January 13, 2011 affidavit any discussion of the volume of calls between TT3 and Edwards, Richards, and Moorer.[3] Def. Bowman's Mot. at 5. Defendant Bowman offers that the number of contacts between these three co-Defendants and Bowman far exceed the contacts between Bowman and Colter and Ismaeel, who were mentioned in the January 13, 2011 affidavit. *Id.* Defendant Bowman offers no explanation as to why inclusion of this information in the January 13, 2011 affidavit would have defeated probable cause, and the Court will not make Defendant's arguments for him.

Defendant Bowman also emphasizes information purportedly provided by CS–4, referenced by the Government for the first time in the March 19, 2011 affidavit in support of the first application for a wiretap interception on TT3. 3/21/11 Pak Aff. ¶ 21. The affidavit indicates that CS–4 has provided information to law enforcement agents for at least 10 years, has known

---

**3.** To the extent Defendants are correct that the Government was obliged by statute to disclose Edwards as a target of the January 13, 2011 authorization, *see United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), this does not mean the Court is required to suppress the results of the inter-

ceptions. The Defendants never contest the Government's assertion that the good faith exception to the exclusionary rule would apply, and the intercepted communications would thus still be admissible. Gov't Resp. at 24.

Bowman, Edwards, and Richards for over ten years, and in February 2011, informed law enforcement officials that he had seen Edwards and Bowman together in the last three months. *Id.* CS–4 also "advised that through CS–4's own observations and familiarity with Richards, Edwards, and Bowman, CS–4 knows that they are acquainted and are working in concert to traffick in narcotics." *Id.* From this, Defendant Bowman argues that "[t]hose assertions, in addition to the pen register information taken from Mr. Edwards' telephone, support the defendant's position that law enforcement knew of the drug operation and its participants for many years." Defendant Bowman offers no proof to support his assertion that law enforcement knew of CS–4's "own observation and familiarity" prior to February 2011, or what those observations might have entailed.

■ Similarly, Defendant Edwards argues—yet again, for the first time in his Reply—that "Agent Pak's introduction of CS4 in the March 19 Affidavit is extremely misleading because it gave the issuing courts the false impression that law enforcement learned of the illicit relationship between Bowman, Edwards, and Richards from CS4." Def. Edwards' Reply at 7. The Court notes that Defendant Bowman's argument regarding CS–4 in fact implies that the Government did learn about this "illicit relationship" from CS–4. In any case, the Defendants fail to articulate how this representation was material to the finding of probable cause or necessity in January or March 2011. The omission of a cooperating source does not, without more, invalidate a warrant that otherwise establishes probable cause and the necessity of interceptions. *Becton*, 601 F.3d at 597.

Absent evidence CS–4 provided the Government with information that would overcome the probable cause or necessity showings in Special Agent Pak's Affidavit(s), the omission of CS–4 from the January 13, 2011 wiretap application was immaterial.

2. *The Omitted Investigations Do Not Show Traditional Investigative Techniques Would Have Revealed the Full Scope of the Conspiracy*

■ Defendants finally argue that the specific methods employed by agents during the earlier investigations demonstrate traditional tools were adequate to achieve the objective of the investigation. Initially, it is important to note that none of the traditional investigative techniques referenced by the Defendants as part of this argument were employed against *Bowman*, and therefore do not disturb the finding that such techniques would not reveal the full scope of Bowman's drug trafficking organization. Additionally, these prior investigations reinforce the conclusion that such techniques could reveal the full scope of Bowman's organization, rather than undermine such a conclusion.[4] There is no allegation that Edwards was ever charged, much less convicted, of any offenses in connection with the early 2000s, 2004, or 2007 investigations. The 2008 search warrant concerning Jones and Richards likewise failed to lead to any convictions. Neither the 2004 search of Edwards' residence, nor Ms. Belton's Grand Jury testimony yielded any identifiable results. The Court notes that Defendants failed to offer any explanation as to what information law enforcement obtained from these traditional techniques such that the Court could find these meth-

---

**4.** Defendant Edwards cites no authority for his assertion that the Government is obliged to include every possible fact that might sup-

port a showing of necessity in an application for a Title III wiretap. *See* 18 U.S.C. § 2518(1)(c).

ods overcome the facts in the Affidavit supporting the necessity of a wiretap. Just because the Government utilized certain techniques in the past does not mean that (1) those techniques achieved the full objective of the investigation, *Becton*, 601 F.3d at 596, or (2) that the situations in which those methods were employed were sufficiently analogous so as to be relevant to the effectiveness of the same methods in the investigation at issue in this case. The prior uses of traditional investigatory techniques as proffered by the Defendants simply would not disturb the necessity finding based on Special Agent Pak's Affidavit, and are therefore immaterial and do not warrant a *Franks* hearing.

## IV. CONCLUSION

For the reasons stated above, the Court finds the Title 3 wiretap interceptions employed in this case were properly authorized. The Affidavit submitted by FBI Special Agent Timothy Pak in support of the wiretap applications provided sufficient factual detail of this particular investigation to support a finding that traditional investigatory techniques were inadequate to reveal the full scope of Defendant Bowman's alleged drug trafficking conspiracy, satisfying the "necessity requirement" for obtaining a wiretap. The Defendants failed to identify any non-relevant conversations intercepted as part of the wiretaps, therefore the Court need not examine the Government's minimization efforts. The prior investigations of Defendant Edwards and his "associates," if included in the affidavit, would not have undermined the stated purpose for the wiretap. Finally, information regarding the prior investigative techniques would not have altered the

finding of necessity. Since the omitted investigations were not material to the finding of probable cause to issue the wiretaps, the Defendants are not entitled to a *Franks* hearing on their challenge to the facially valid affidavit. Accordingly, Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications is GRANTED; Defendant Edwards' [241], [242], [244], and Defendant Bowman's [248], [252], [253], [256], and [257] motions *in limine* are DENIED. An appropriate Order accompanies this Memorandum Opinion.

## MEMORANDUM OPINION

Presently before the Court is Defendant Gezo Edwards' [390] Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications. The Court previously denied Defendant Edwards's [244] Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications, which sought to suppress evidence obtained pursuant to a court-ordered wiretap interception of three cellular telephones purportedly operated by Defendant William Bowman. 7/26/12 Order, ECF No. [353]; 7/26/12 Mem. Opin., ECF No. [354].[1] As indicated on the record during the September 7, 2012 Status Hearing, Defendants Bowman and Henry Williams join in Defendant Edwards' motion. Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, Defendant Edwards' motion to reconsider is DENIED.

---

1. For purposes of this Memorandum Opinion, the Court presumes familiarity with the prior Memorandum Opinion.

2. See Def.'s Mot., ECF No. [390]; Gov't's Opp'n, ECF No. [399]; Def.'s Reply, ECF No. [409]; Def.'s Am. Reply, ECF No. [419]; Gov't's Suppl. Opp'n, ECF No. [424].

## I. BACKGROUND

The Court detailed the factual history relevant to Defendant Edwards' motion at length in its Memorandum Opinion denying Edwards' initial motion, 7/26/12 Mem. Opin. at 2–6, and incorporates herein that opinion in full. In short, as part of its investigation of the charged conspiracy, the Government obtained orders authorizing the interception of wire communications to and from three cellular telephones allegedly operated by Defendant Bowman, referred to as "TT1," "TT2," and "TT3." *Id.* at 2–4. The Government obtained the relevant authorizations for TT2 on January 13, February 11, March 11, and April 8, 2011. *Id.* at 4–5. The affidavit filed in support of the applications, signed by FBI Special Agent Timothy S. Pak, did not disclose Defendant Edwards as a possible target of the interception until the April 8, 2011 application. *Id.* at 5. The Government obtained authorizations for TT3 on March 19 and April 15, 2011. Defendant Edwards was disclosed as a possible target of the TT3 interception in both applications. *Id.* All three defendants are charged with conspiracy to distribute and possess with intent to distribute five kilograms or more cocaine. Superseding Indictment, ECF No. [28], at 2–3. Defendants Edwards and Bowman face a number of additional narcotics distribution and/or weapons charges. *Id.* at 3–7.

## II. LEGAL STANDARD

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, provides that a district court may authorize an application for interception of certain wire, oral, and/or electronic communications. 18 U.S.C. § 2518. Section 2518(1) sets forth the requirements for applications seeking Title III authorizations, and provides that applications must include, among other information:

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including ... (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted; [and]

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application[.]

18 U.S.C. § 2518(1)(b), (e). Defendant Edwards, as an "aggrieved person," *see* 18 U.S.C. § 2510(11), moves to suppress the contents of the interceptions on the basis that the communications were "unlawfully intercepted." 18 U.S.C. § 2518(10)(a).

## III. DISCUSSION

Although styled as a motion to reconsider, Defendant Edwards' motion is more accurately characterized as a renewed motion to suppress insofar as it raises new arguments to support his contention, as opposed to identifying new factual information or errors in the Court's previous decision. The Court agrees with the Government that the Defendant could and should have raised these arguments in the context of his initial motion, and thus the motion to reconsider is untimely under the Court's schedule for pretrial motions. However, the Court declines to deny Defendant's motion outright on this basis. All of the parties in this case, including the

Government, have failed to comply with Court-ordered deadlines regarding pretrial motions at various points, and the Government has not articulated any prejudice from the timing of the Defendant's motion to reconsider. Accordingly, the Court shall address the merits of the Defendant's motion.

The Defendant does not take issue with the Court's previous findings that (1) the affidavits filed in support of the Title III applications in this case met the "necessity requirement" articulated in Section 2518; (2) the affidavits did not omit any material information; and (3) the Government complied with the statutory "minimization requirement" in carrying out the authorized interceptions. Def.'s Mot. at 2 n.1. Instead, the Defendant argues that the TT2 applications submitted on January 13, February 11, and March 11 failed to meet the statutory requirements found in Section 2518(1)(b)(iv) and (e) because they (1) failed to disclose Defendant Edwards as a possible target of the interception; and (2) failed to disclose previous authorizations for interceptions involving Defendant Edwards. The Defendant also for the first time responds to the Government's contention that the good faith exception to the exclusionary rule would apply in the event the Court finds the interceptions at issue were unlawful. For the reasons explained below, the Court finds the Government was not required to disclose Defendant Edwards as a possible target, nor was it obligated to disclose previous authorizations for interceptions concerning Defendant Edwards. Accordingly, the Court does not reach the parties' arguments regarding the good faith exception.

A. *The Government Was Not Obligated To Disclose Defendant Edwards As A Possible Target On TT2 Prior to April 8, 2011*

▮ The Defendant initially argues that pursuant to Section 2518(1)(b)(iv), the Government should have disclosed Defendant Edwards as a person "committing the offense and whose communications are to be intercepted" at the very least in the March 2011 application for TT2. The Supreme Court interpreted this section to require that a wiretap application name an individual if the Government (1) "has probable cause to believe that the individual is engaged in the criminal activity under investigation"; and (2) "expects to intercept the individual's conversations over the target telephone." *United States v. Donovan*, 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The *Donovan* court further held that a violation of Section 2518(1)(b)(iv) is not a basis for suppressing the intercepted communications. *Id.* at 439–440, 97 S.Ct. 658. As such, the Defendant's success on this argument alone would not justify granting the Defendant's motion. However, because the Defendant's second basis for reconsideration is dependent on the Government's obligations under Section 2518(1)(b)(iv), the Court considers the substance of the Defendant's argument.

Echoing the theme of his initial motion, Defendant Edwards contends that the Government had but did not divulge extensive knowledge of Defendant Edwards' involvement with Defendant Bowman before the March 11, 2011 application for renewal of the TT2 wiretap. Specifically, the Defendant argues that:

(a) in January 2011, the Government knew Bowman and Edwards were associates;

(b) in early February 2011, the Government knew Bowman and Edwards "communicated frequently," and Bowman suddenly obtained narcotics;

(c) in late February 2011, the Government knew that Edwards, Bowman,

and Defendant Robert Richards "were associating for trafficking in narcotics"; and

(d) on March 8–9, 2011, the Government knew that in 2007, a federal Judge issued authorizations for wiretaps and closed-circuit television monitoring concerning Defendant Edwards.

Def.'s Mot. at 6. Contrary to Defendant's assertion, the Court never found "(a)" to be true; rather, the Court noted that *"[a]t best,"* the Defendant "ma[d]e a substantial showing that as of January 2011, the Government knew Edwards and Bowman were associates." 7/26/12 Mem. Opin. at 22. Assuming *arguendo* that the above information accurately reflects the Government's knowledge, it at best establishes that as of March 11, 2011 the Government had probable cause to believe Edwards was engaged in the criminal activity under investigation.[3] It does not show that the Government expected Defendant Edwards' conversations to be intercepted over TT2.

 Neither party directly addressed the level of certainty required before the Government can be said to "expect" that an individual's conversations will be intercepted over a target telephone, but the consensus amongst the Court of Appeals is that the Government is not required to disclose a target unless the Government has probable cause to believe that an individual's conversations will be intercepted over the target telephone. *United States v. Bennett,* 825 F.Supp. 1512, 1522–23 (D.Colo.1993) (collecting cases). The Defendant's motion falls far short of demonstrating the Government had probable cause to believe Defendant Edwards' con-

versations would be intercepted over TT2. Despite numerous opportunities to do so, the Defendant has never contested the Government's assertion that "the pen register on TT2 did not show any calls between Bowman and telephone numbers known or believed to be associated with Edwards." Gov't's Omnibus Resp., ECF No. [290], at 23 n.14. By contrast, pen register data reflected hundreds of activations between Defendant Edwards and Defendant Bowman on TT3 beginning at least in January 2010. *Id.;* 3/19/11 Aff. of T. Pak, ¶ 23. To the extent the Government knew Defendants Bowman and Edwards were "associates" involved in the criminal activity under investigation, there is nothing in the record before the Court to indicate the Government should have expected Edwards to suddenly communicate with Bowman via TT2, as opposed to TT3.

The only argument Defendant Edwards offers with regards to the second requirement articulated in *Donovan* is buried in a footnote in the Defendant's motion, in which the Defendant asserts that

[T]he technology available today allows law enforcement to use the target telephone as a type of monitor from which it can listen to individuals speaking in proximity to the target device. Considering that the Court has found that Pak knew Edwards and Bowman were associates in January 2011, it follows that associates purportedly engaged in drug trafficking would occasionally meet in person. Thus, it is not far fetched to infer that Pak also knew that the Edwards would be intercepted in back-

---

3. N.B. The Government disputes Defendant Edwards' account of when the Government learned of Defendant Edwards' involvement with the purported conspiracy involving Defendant Bowman. *E.g.,* Gov't's Opp'n at 6 & n.3. The Court draws no conclusion as to

what information regarding Defendant Edwards the Government actually had in its possession at any given time, but presumes without deciding for purposes of this motion that the Defendant's description is correct.

ground conversations near Bowman's telephone.

Def.'s Mot. at 6 n.4. The Court does not read the affidavit to indicate the Government can use the target telephone as a remote listening device capable of intercepting conversations when the telephone itself is not in use. Rather, what that affidavit reflects is that during the course of a conversation taking place over a target telephone, agents may overhear conversations taking place in proximity to, but not through, one of the telephones involved in the activation. The relevant question then is whether the Government should have expected to intercept Defendant Edwards' conversations to the extent they took place in proximity to, but not through, a telephone involved in a call with TT2.

By Defendant Edwards' own argument, the Government did not know Defendants Edwards and Bowman were involved in narcotics trafficking together until "late February 2011." Def.'s Mot. at 6. Assuming this were true, the Defendant offers no evidence to show the Government had probable cause to believe that as of March 11, 2011, Defendants Edwards and Bowman met in person often enough that Edwards would be intercepted as part of "background conversations" taking place in proximity to an activation involving TT2. The Defendant believes that it "is not far[-]fetched to infer that [the Government] also knew that Edwards would be intercepted in background conversations near Bowman's telephone," Def.'s Mot. at 6 n.4, but the Defendant's inference does not amount to probable cause. The Defendant fails to provide any evidence from which the Court could find the Government expected to intercept Defendant Edwards' conversations over TT2. Therefore, the Government was not required to disclose Edwards as a possible target prior to the April 8, 2011 application for TT2.

## B. The Government Was Not Obligated To Disclose Previous Applications Concerning Defendant Edwards

The Defendant also argues that the Government violated the requirements of Section 2518(1) by failing to disclose in the renewal applications for TT2 two applications for authorization of interceptions obtained with respect to Defendant Edwards in 2007. Section 2518(1)(e) requires Title III applications to include "all previous applications" for approval of interceptions "involving any of the same persons, facilities or places specified in the application." As articulated above, the Government did not err in omitting Defendant Edwards from the January, February, and March applications for TT2. At the point the Government did not need to name Edwards in the application, under the plain language of Section 2518(1)(e), it was under no obligation to disclose prior applications involving Defendant Edwards.

The Defendant contends that this conclusion "eviscerate[s] the express language and intent of the statute because the government could simply not list someone to avoid having to disclose prior applications relating to that person." Def.'s Mot. at 7 n.5. Defendant's concern is unwarranted. Pursuant to *Donovan*, the Government does not have unfettered discretion to decide which individuals to disclose as targets of a proposed interception. If the Government must name a target per the standard set forth in *Donovan*, the plain language of Section 2518(1)(e) requires the Government to identify all prior applications involving that individual. Conversely, as is the case here, if the Government is not required to disclose an individual as a possible target, Section 2518(1)(e) does not require the Government to disclose prior applications involving that individual. The Government was not obliged to disclose

Defendant Edwards as a possible target on TT2 in connection with the January, February, or March 2011 applications. Once the Government identified Edwards as a possible target on TT2 in the April 2011 application, it disclosed the 2007 applications as required by Section 2518(1)(e). 4/8/11 Aff. of T. Pak, ECF No. [247–7], ¶¶ 63–64. The Government's applications for authorization to intercept wireless communications over TT2 met the statutory requirements outlined in Section 2518(1)(e).

## IV. CONCLUSION

For the reasons stated above, the Court finds no basis on which to suppress the evidence obtained from interceptions of wireless communications from cellular telephones purportedly operated by Defendant Bowman. Even if the Court were to assume the Government had probable cause to believe that Defendant Edwards was engaged in the criminal activity under investigation before March 19, 2011, the Defendant failed to show the Government expected Defendant Edwards' conversations to be intercepted over TT2. Therefore, the Government was not obligated to disclose Edwards as a possible target of the interception. Moreover, at the point the Government was not required to identify Edwards as a potential target of the interception, the Government was likewise not required to disclose prior applications for interceptions concerning Defendant Edwards. Thus, the Government's applications for interceptions of cellular telephones allegedly operated by Defendant Bowman met the statutory requirements. Absent any violation of the statutory re-

quirements, Defendant Gezo Edwards' [390] Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications is DENIED and the Court does not reach the parties' arguments regarding the applicability of the good faith exception to Title III wiretaps.

An appropriate Order accompanies this Memorandum Opinion.

## MEMORANDUM OPINION

Defendant Gezo Edwards is charged by superseding indictment with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, and one count of carrying a firearm during and in relation to or possessing a firearm in furtherance of a drug trafficking offense. Much of the evidence the Government seeks to present against Edwards at trial was derived—directly or indirectly—from court-authorized wiretaps of two telephones associated with Edwards' co-Defendant William Bowman. For the third time, Edwards asks the Court to suppress the wiretap as illegally obtained, specifically for failing to disclose Edwards as a possible target of the interceptions until the third renewal of the wiretap. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, for the reasons stated below, Defendant Edwards' [515] Motion for Leave to File Defendant's Pro Se Motion is GRANTED,[2] and Edwards' [515–2] Pro Se Motion to Reconsider Denial of Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from

---

1. See Def.'s Mot., ECF No. [515–2]; Gov't's Opp'n, ECF No. [517]; Gov't's Suppl. Opp'n, ECF No. [521]; and Def.'s Reply, ECF No. [522].

2. Although ultimately unpersuasive and legally insufficient, the Court finds the Defendant's motion to reconsider is not entirely frivolous. Therefore, the Court will turn to the merits of the Defendant's *pro se* motion despite the fact he is currently represented by counsel.

Interception of Wire Communications in Light of New Evidence is DENIED.

## I. BACKGROUND

The Court detailed the factual history relevant to Defendant Edwards' motion at length in its prior Memorandum Opinion denying Edwards' motion regarding the wiretap, 7/26/12 and 9/16/12 Mem. Opins., ECF Nos. [354, 432], and incorporates herein those opinions in full. In short, the three remaining co-Defendants, Edwards, Bowman, and Henry Williams, are charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. Superseding Indictment, ECF No. [28], at 2–3. Defendants Edwards and Bowman also each face one count of carrying a firearm during and in relation to or possessing a firearm in furtherance of a drug trafficking offense. *Id.* 6–7.[3] As part of its investigation of the charged conspiracy, the Government obtained orders authorizing the interception of wire communications to and from three cellular telephones allegedly operated by Defendant Bowman, referred to as "TT1," "TT2," and "TT3." 7/26/12 Mem. Opin. at 2–4. The Government initially obtained a wiretap authorization for TT1 on December 7, 2010, but the wiretap was terminated on December 27, 2010, due to a lack of activity. *Id.* at 3. The Government obtained the relevant authorizations for TT2 on January 13, February 11, March 11, and April 8, 2011. *Id.* at 4–5. The affidavit filed in support of the applications for TT2, signed by FBI Special Agent Timothy S. Pak, did not disclose Defendant Edwards as a possible target of the interception until the April 8, 2011 application. *Id.* at 5. The Government first obtained a wiretap authorization for TT3 on March 19, 2011, which was renewed on April 15, 2011. Defendant Edwards was disclosed as a possible target of the TT3 interception in both applications. *Id.* The orders authorizing the wiretaps on TT2 and TT3 permitted the Government to "intercept wire communications to and from the [target telephones], including *any background conversation intercepted in the vicinity of the [the target telephone] while the telephone is off the hook or otherwise in use.*" Gov't Ex. A (1/13/11 Order re TT2), ECF No. [290–1], at 3; *accord* Gov't Ex. B (2/14/11 Order re TT2), ECF No. [290–2] at 4; Gov't Ex. C (3/11/11 Order re TT2), ECF No. [290–3], at 4; Gov't Ex. D (4/8/11 Order re TT2), ECF No. [290–4], at 5; Gov't Ex. E (3/19/11 Order re TT3), ECF No. [290–5]; at 4; Gov't Ex. F (4/15/11 Order re TT3), ECF No. [290–6], at 4.

## II. LEGAL STANDARD

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, provides that a district court may authorize an application for interception of certain wire, oral, and/or electronic communications. 18 U.S.C. § 2518. Defendant Edwards, as an "aggrieved person," *see* 18 U.S.C. § 2510(11), moves to suppress the contents of the interceptions on the basis that the communications were "unlawfully intercepted." 18 U.S.C. § 2518(10)(a). Section 2518(1) sets forth the requirements for applications seeking Title III authorizations, and provides that applications must include, among other information:

[A] full and complete statement of the facts and circumstances relied upon by

---

**3.** Although the Superseding Indictment charges Defendant Edwards with two weapons charges and Defendant Bowman with three, the parties agreed orally on the record on October 22, 2012, that, pursuant to *United States v. Anderson,* 59 F.3d 1323 (D.C.Cir. 1995), the charges merge into a single count since they derive from a single predicate offense—the alleged conspiracy.

the applicant, to justify his belief that an order should be issued, including ... (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted[.]

18 U.S.C. § 2518(1)(b) ("Subsection b"). Subsection b requires the Government to name an individual as a possible target of a wiretap if the Government (1) "has probable cause to believe that the individual is engaged in the criminal activity under investigation"; and (2) "expects to intercept the individual's conversations over the target telephone." *United States v. Donovan*, 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

## III. DISCUSSION

The Defendant's present motion asks the Court to reconsider its denial of Edwards' previous motion to dismiss on the grounds that "newly discovered facts" demonstrate that, as of March 11, 2011, the Government had probable cause to believe it would intercept Defendant Edwards' conversations in the background of wire communications intercepted over TT2. The "new facts" identified by Defendant Edwards, viewed in the light most favorable to the Defendant, do not justify granting the Defendant's motion. Although the Government may have been generally obligated to disclose the identity of any person who met the *Donovan* criteria but whose conversations would only be intercepted in the background of the wiretap, the record does not indicate the Government had probable cause as of March 11 to believe it would intercept Defendant Edwards' conversations in the background of TT2 activations. Moreover, Defendant Edwards' motion cannot succeed as the Supreme Court indicated in *Donovan* that any error in this regard by the Government would not be a basis for suppressing the wiretap.

### A. Scope of the Government's Disclosure Requirement

In response to the Court's inquiry, the Government indicated in its opposition that it was unable to find any legal authority to support the position that it was required to "list a person as a target in a Title III application where the person otherwise meets the requirements under *Donovan*, but whose conversations would only be overheard in the background during intercepted wire communications." Gov't's Opp'n ¶ 2. The Court likewise was unable to locate any direct legal authority on this point. Much of the case law concerning background conversations concerns the legality of the use of such conversations if the interception of background conversations was not specifically authorized by the order authorizing the wiretap. *E.g., United States v. Baranek*, 903 F.2d 1068, 1071–72 (6th Cir.1990) (finding use of information obtained from the interception of background conversations, although not explicitly authorized by the wiretap order, was permissible pursuant to the "plain view" doctrine); *United States v. Couser*, 732 F.2d 1207, 1209–10 (4th Cir.1984) (holding the interception of background conversations, even if not permitted on the face of the wiretap order, was not a basis for suppressing the wiretap). However, the plain language of Subsection b—requiring the disclosure of "the identity of the person, if known, committing the offense and whose communications are to be intercepted"—would appear to encompass all communications recorded as a result of the wiretap, regardless of the whether the conversation took place over, or merely in the vicinity of, the target telephone. The *Donovan* Court specifically referenced conversations that would be intercepted "over the target telephone," 429 U.S. at 428, 97 S.Ct. 658, but there is nothing to indicate that the *Donovan* Court consid-

ered, much less intended to absolve the Government of any obligation to identify individuals whose conversations may be intercepted in the background of the target telephone. *Cf. United States v. Borch,* 695 F.Supp. 898, 900 (E.D.Mich.1988) (explaining that background conversations can be considered to have been intercepted "over" the target telephone). In any event, the Court need not resolve the scope of the Government's burden in this respect because the Defendant failed to show that he should have been named as a target even if the *Donovan* requirements applied to backgrounds conversations.

### B. The Government Was Not Obligated To Disclose Defendant Edwards As A Possible Target On TT2 Prior To April 8, 2011

Before addressing the purportedly new facts the Defendant includes in his motion, the Court notes that the Defendant misconstrues one aspect of the Court's September 16, 2012 Memorandum Opinion. Contrary to the Defendant's assertion, the Court did not find that the Government was required to disclose Edwards as a possible target in the April 8, 2011 application for renewal of the wiretap as to TT2. The Court explicitly found that "the Government was not required to disclose Edwards as a possible target prior to the April 8, 2011 application for TT2," but made no findings as to the April 8 application because the issue is irrelevant: the Government in fact named Edwards as a target in the April 8 application concerning TT2. Not only was the issue irrelevant,

neither party presented evidence as to the Government's knowledge as of April 8 such that the Court could draw such a conclusion. Section III.A. of the Court's September 16, 2012 Memorandum Opinion held only that the Government was not required to disclose Edwards as a target in the January, February, or March applications for authorization of wiretap interceptions over TT2. Accordingly, the Court does not address any of the factual claims Defendant Edwards makes regarding events that occurred after March 11, 2011.

The crux of the Defendant's argument is that, as of March 11, 2011, the Government had sufficient evidence to show probable cause that Edwards' was engaged in drug trafficking with Bowman, and Edwards' conversations would be intercepted in the background of TT2. For purposes of this motion, the Court assumes, but does not decide, that Edwards' first contention is correct. As to his second argument, at best, the evidence in the record cited by the Defendant demonstrates the following:[4]

- Between January 27, 2010 and March 11, 2011, pen register data reflected 939 attempted and completed calls between a number associated with Edwards and *TT3*. 3/19/11 Aff. of T. Pak (Aff. in support of application re TT3), ECF No. [247–6], ¶ 23.

- January 6, 2011: handwritten notes from FBI Special Agent Bevington describe some connection between Bowman, Edwards ("Zoe"), and several purported co-conspirators, Def.'s Ex. 2;[5]

---

4. The Defendant cites various other evidence concerning the Government's knowledge regarding Edwards' involvement in the illicit activity under investigation. The Court does not address that evidence because it relates only to the first prong of the Court's *Donovan* analysis, which the Court presumes was satisfied.

5. In its Supplemental Opposition, the Government asserts that the "2011" date on the notes was in error, and that the notes were actually transcribed as part of an interview that took place on January 6,2012. Gov't's Suppl. Opp'n ¶ 1. The Court does not make any finding as to the actual date because, even in combination with the other evidence

- February 3, 2011: Edwards' vehicle was seen parked in the immediate vicinity of Bowman's address on Quill Point Avenue, Def.'s Ex. 8; Gov't's Suppl. Opp'n at 2 n1.
- February 8, 2011: GPS data regarding TT2 places the phone within 88 meters of the Rolling View Drive residence associated with Edwards, Def.'s Ex. 6a;
- Late February 2011: Confidential Source "4" discloses that he had seen Edwards and Bowman together in the past several months, 4/8/11 Aff. of T. Pak (Aff. in support of application re TT2), ECF No. [247–7], ¶ 35;
- March 9, 2011, GPS data regarding TT2 places the phone within 64 to 98 meters of Edwards' Rolling View Drive address at 12:28 and 12:43 PM. Def.'s Exs. 6b, 6c. TT2 was located within 121 meters of Edwards' Elm Grove Circle address at 2:00 PM. Def.'s Ex. 6d. That same day, calls were attempted or completed with TT2 at 12:14 PM, 12:38 PM, 12:47 PM, 1:34 PM, and 1:44 PM. Def.'s Ex. 7.
- March 10, 2011: the first surveillance of Bowman and Edwards together occurred.

The Defendant also alleges the Government had access to his Facebook account, which included pictures showing Edwards and Bowman at social events together, including Edwards' childrens' birthday parties. Def.'s Ex. 9 (Aff. of Damion Halliburton). Taken together, the evidence cited by Edwards is insufficient to show the Government should have disclosed Edwards as a possible target.

The Defendant's motion implicitly and explicitly requires the Court to make a number of assumptions to draw the conclusion the Defendant urges. The Defendant would have the Court assume Edwards and Bowman met face to face on all occasions on which GPS data places TT2 within the vicinity of an address associated with Edwards, and that Edwards was in fact in the vicinity of TT2 at the time calls were attempted or completed. Drawing all of the inferences and making all of the assumptions the Defendant requests, the Court could only conclude that the Government had evidence that Defendants Edwards and Bowman were in the same place at the same time on three dates in the month prior to the March 11 application for TT2. Moreover, the Defendant has only identified a single date on which Defendant Bowman may have used TT2 while in the presence of Edwards. Regardless of the Government's knowledge of Bowman and Edwards' relationship generally, during the month prior to the reauthorization at issue, the Government had no evidence to indicate regular in-person meetings between Edwards and Bowman during which Bowman had possession of TT2.

In its opposition, the Government notes that the Defendant failed to identify a single instances in which Edwards' background conversation was intercepted during the first two months of the wiretap of TT2. Gov't's Opp'n ¶ 6. The Defendant contends that this argument is essentially hindsight bias, and is irrelevant to the question of whether the Government should have expected to intercept such conversations as of March 11. Def.'s Reply ¶ 8. The evidence discussed by the parties fall into two categories: (1) information available to the Government before it sought re-authorization for the TT2 wiretap on March 11; and (2) information

in the record, notes indicating the Government knew of Edwards and Bowman's association in January 2011 would not establish

probable cause under the second prong of *Donovan.*

obtained after the March 11 application, but before the April 8 application in which Edwards was listed as a possible target.[6] The Defendant is correct that the second category, evidence of intercepted background conversations involving Edwards—or the lack thereof—between March 11 and April 8 is irrelevant to the Court's analysis of the Government's burden.

However, the evidence available to the Government prior to March 11 is directly relevant to the question of what or who the Government should have disclosed as part of the March 11 application. In particular, evidence of what the Government obtained, or did not obtain, from the wiretap of TT2 pursuant to the first two authorizations would strongly inform what the Government could and should have expected from the third authorization, which is sought on March 11. At this point in time, the Defendant has not identified as single activation of TT2 between January 13 and March 11 that intercepted a conversation with Defendant Edwards. Even imputing perfect knowledge of all intercepted conversations to the Government, there is nothing in the record to indicate that prior to March 11, the Government actually intercepted over TT2 any direct or background conversation involving Defendant Edwards. Thus, in drafting the March 11 application concerning TT2, the Government had to weigh evidence of three meetings between Edwards and Bowman, including two during which Bowman may have had TT2 on his person, compared to nearly two months of recorded interceptions over TT2, none of which involved Defendant Edwards. On this record, the Government had no reason to believe Edwards' conversations would be suddenly intercepted over TT2 after March 11, and therefore was not required to disclose Edwards as a possible target of the TT2 wiretap.

The Defendant argues that based on how often he and Defendant Bowman met in-person, the Government should have "inferred" that at some point his background conversations would be intercepted over TT2. It was reasonable for the Government *not* to make such an inference given the circumstances of the investigation. First, although the Defendant cites evidence indicating the Government knew of Edwards' association with Bowman as early as January of 2010, the amount of face-to-face interaction two individuals may engage in naturally may vary over time. In the two months preceding the March 11 wiretap application, the evidence available to the Government indicated only limited face-to-face interactions between Edwards and Bowman. Second, the Government was aware that Defendant Bowman used certain telephones to communicate with certain individuals. Even if the Government should have inferred Edwards would have been intercepted in the background of *a* telephone carried by Defendant Bowman, there is nothing to suggest the Government could or should have inferred that telephone would be TT2. For the same reason, the Defendant's claim that "there is more than a fair probability that known drug associates meet often to conduct their business," did not compel the Government to disclose Edwards as a target; even if true as a general principle, the evidence available to the Government indicated Edwards and Bowman did not meet often to conduct their business, or do so in the vicinity of TT2. The Defendant's argument would derive probable cause from a combination of disproven behavioral assumptions and random chance, evidence far short of what *Donovan* requires.

6. The parties also emphasize March 19, the date of the first application regarding TT3.

In sum, drawing all reasonable inferences in Defendant Edwards' favor, the record before the Court does not show that as of March 11, 2011, the Government had probable cause to believe Defendant Edwards' conversations would be intercepted in the background of activations or other recordings made over TT2. Even if the Court were to find probable cause on the record presented by the Defendant, the Court would still be compelled to deny the Defendant's motion. After setting forth the disclosure requirement under Subsection b in *Donovan*, the Supreme Court ultimately concluded that the failure to include a possible target in a wiretap application was not a basis for suppressing the wiretap. *Donovan*, 429 U.S. at 439–440, 97 S.Ct. 658. Bound by this precedent, the Court must deny the Defendant's motion.[7]

## IV. CONCLUSION

For the reasons stated above, the Court once again declines to suppress the wiretap of TT2 and related evidence. Drawing all reasonable inferences in favor of Defendant Edwards, the Defendant demonstrated only that the Government knew Defendants Edwards and Bowman met in-person on three occasions prior to the March 11 request to re-authorize the wiretap on TT2. GPS data indicates Bowman may have had TT2 on his person during these meetings, and on one occasion at least two calls or attempted calls were made to/from TT2 while Bowman was in the vicinity of an address associated with Defendant Edwards. Pursuant to the

first two orders authorizing interception of wire communications over TT2 issued on January 13 and February 11, the Government did not intercept any conversations (background or otherwise) in which Defendant Edwards took part. This reinforces the conclusion that the Government lacked probable cause to believe that as of March 11, the Defendant Edwards' conversations suddenly would be intercepted over TT2. The Government's knowledge of Edwards and Bowman's association was not, in and of itself, sufficient evidence to require the Government to disclose Edwards as a possible target of the TT2 wiretap on March 11, 2011. In any case, the Court is bound by the Supreme Court's decision in *Donovan* that even if the Government's omission of Edwards from the March 11 application regarding TT2 was in error, the Court cannot suppress the wiretap on that basis. Therefore, Defendant Edwards' [515] Motion for Leave to File Defendant's Pro Se Motion is GRANTED, and Edwards' [515-2] Pro Se Motion to Reconsider Denial of Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications in Light of New Evidence is DENIED.

An appropriate Order accompanies this Memorandum Opinion.

---

7. Curiously, the Government failed to raise this issue until its Supplemental Opposition, filed two days after its initial Opposition. It should go without saying that a complete opposition is expected the first time, and the parties should not assume the Court will provide the parties with an opportunity to supplement deficient pleadings. Moreover, the Court expects that any issues relating to the timing of the Court's disposition of motions filed by either party would be promptly raised. With a lengthy trial ahead, the Court cannot afford delays caused by counsels' failure to bring critical issues to the Court's attention.